ok, Mr. Sherkert.. May it please the court. The district court assumed for summary judgment purposes that Suncor failed to deliver the agreed upon committed volumes, the agreed upon amounts of crude for which the parties bargained. But the district court essentially ruled that Muscat has no remedy under the contract for that breach. The district court's critical error, we submit, was in not enforcing the parties' agreement that the confirmation, the second document that makes up, together with the master services agreement that makes up the entire agreement, governs in the event of a conflict between the two documents. The MSA itself says so on page 212 of the record, and the confirmation expressly states in so many words, at record 232, in the event of a conflict between this transaction and the master agreement, this transaction shall govern. So the confirmation document governs in the event of a conflict. Now the conflict that immediately presented itself was between subsection S of the master agreement, which creates a cover obligation, and that the confirmation governs over the master agreement means that there cannot be an obligation to cover because the confirmation states in so many words at record 230 that Suncor shall be the quote-unquote exclusive supplier at the Windsor Terminal, at our facility. The only cover, by definition, would require purchasing from another entity. That's what cover always means, right? Correct. And as the exclusive, agreeing to have Suncor as the exclusive supplier would put us in breach if we cover it. Now the contract can't mean that. You have to interpret the contract to make sense. And for this individual... You're saying there's no cover obligation whatsoever? Correct. Correct. In the event of a failure... That's just contrary to the UCC. It's contrary to customary commercial arrangements to say that there's no cover. That doesn't... But it's what these parties agreed to by constituting Suncor as the exclusive supplier for this set of transactions. Now it's not for the master agreement, just to be clear, Judge Smith contemplates a number of these sorts of agreements over the life of the master agreement. But for this first one, the parties specifically agreed, for the benefit of both, that Suncor would be the exclusive supplier to the terminal. We weren't short of a steady stream, supposedly, from Suncor, and Suncor knew it had an exclusive deal with us. So you can't have the two existing in the same continuum... When would the obligation to cover ever be utilized? What force does, under your argument, does cover in this agreement have? What role did it play? The agreement plainly contemplates an obligation to cover, you say not here, but what I hear you saying, not anywhere. No, sir, not for this confirmation. The master agreement contemplates a series of confirmations, and I don't need only to look at the confirmation itself, because if you look at the master agreement at page 223, this is sub S, which creates the cover obligation. It begins with... Let me go back to my question. I didn't make myself clear. As I follow your argument, there's an agreement of exclusivity. Yes, sir. You also have references in the subpart S, A or B, I forget which, that deals with the question of cover. Yes, sir. Cover contemplates, obviously, dealing with others, and you're saying that that cannot be. For this confirmation, and I say that with confidence, because the master agreement itself, in the words that precede the cover obligation, S says, except as expressly set forth in this agreement. This agreement is both documents together. When would cover ever be in play? Without an exclusivity. Sorry? Without exclusivity. If in the next transaction, next in the series of transactions that the master agreement contemplated, the parties did not agree on exclusivity, then the obligation to cover would exist, because it would be possible to cover. Otherwise you're in a... My question is, what parts of the contract were not governed by the exclusivity feature? You said there were parts that it would cover. The cover obligation would operate where elsewhere in the contract there was no obligation of exclusivity. When would that be? If there was no obligation of exclusivity? I'm trying to get meaning out of what you're saying. Yes, sir. There is a cover obligation here, and you also have an unqualified obligation here of exclusivity. You're saying, well, there are situations where, in the master agreement, in this paperwork, in the arrangement between these parties, in which there would not be an obligation of exclusivity. I'm sorry. Perhaps I wasn't clear. The master agreement contemplates a series of transactions. In other words, these would not have been the only two documents had the relationship continued. This was for a set period of two years. Two years, they'd renegotiate another confirmation or another transaction. And if in those negotiations the parties took out the exclusivity provision or didn't include it, so to speak, in the next obligation, then the obligation to cover would exist. All I'm saying is that when the parties specifically agreed in the piece of paper that governs in the event of a conflict. Did you have any agreement or relationship between the parties in which there was not to an extent an exclusivity provision operative? Not at the time of this dispute, no. These were the only two documents. It would contemplate another document for the next couple of years if the relationship had continued. The parties had the option to do with that. They agreed it was in their mutual benefit to do that, and they did. And the only way that there could be an obligation to cover is if we were free to deal with someone else. Otherwise, we're in a Hobson's choice. We're, more accurately, the rock in the hard place. If we try to cover, they could declare us in breach. If we don't cover, they say we didn't cover and we have no remedy. And that just can't be resubmitted. That's not a logical construction of the parties. Yes, I agree with that. The cover is the base operation of the law, and you're writing a contract to take away a right that you ordinarily have absent of coverage in the agreement itself. Yes, sir. So any uncertainties or gaps in here is going to work against you. But for the specific language except as otherwise provided, I would agree. The two documents embrace each other, Judge. And they both provide that the confirmation governs in the event of conflict, and the introduction to the cover obligation says except as otherwise provided. We submit that exclusivity is otherwise provided. Otherwise, it would make no sense to have that included. Now, undoing that ruling opens up the liability issue on our entitlement to relief under the contract. The second part of the argument, then, is our damages. And, again, we submit the same error occurred with respect to the court's damages ruling, again, not giving due weight to the confirmation. What the district court said in almost so many words is same analysis that says the cover obligation exists means that the consequential damages limitation in the same subsection also exists. The thing that troubles me about it, as I read this contractual arrangement, it makes perfect sense in a volatile market situation we're dealing with with so many uncertainties can play. And what I see in this as an effort by the parties to allocate risk, as you do in contracts, and who's willing to accept these risks or whatever. You deal with all the interruption, all these kind of problems, et cetera, et cetera, et cetera. And you explicitly take away one of the risks of non-performances in these things by taking away damages, et cetera. So you have, I think, a very carefully drafted set of documents drafted by counsel to allocate those risks. And then you come up with cover and say, well, although cover would be an operative itself, a way of allocating risk because it reduces your exposure to you, for example, because I expect you to be able, if I can't deliver it for you, to go to an alternative source. So you add all that up, and my question is, uncertainties about the allocations here, it seems to me, work against you. That is, uncertainties that would say that there's no obligation of cover. Judge, I understand, and if we were only under the master agreement, that would be exactly right. But the agreement contemplates a fairly long life of this relationship. And just exactly as you said, Your Honor, the market conditions change, the needs of the parties change. At any time during your relationship, was there an obligation to cover? No, the relationship never extended beyond the first confirmation. It fell apart, which is where we are today. Beginning to end, there was never an obligation to cover. But there might have been if you had gone to some other deal. Is that what it is? There might have been. Beginning to end in your relationship, by your argument, there was never an obligation to cover. In the beginning to end of the relationship, as it happened, not as it was contemplated, just as you said, the market's volatile. So the parties contemplated that each set of deliveries for a given period of time would have its own agreement. And at the time this confirmation was negotiated, the parties obviously believed that exclusivity was in their mutual interests. And they built into the master agreement with the accept as otherwise provided language and with the flat rule that the confirmation will always govern, that the exigencies of the individual set of transactions would always have to govern. Otherwise, they'd be bound by this ironclad agreement for all time in, as you say, a very volatile market. So it was exactly for that reason, we submit, that the individual confirmation was to be given controlling weight. And in this particular confirmation, Suncor had to be the exclusive supplier. And I think it's a pretty safe bet that Suncor maybe figured it could happen both ways, meaning they had exclusivity, and if we didn't cover, we'd be in breach no matter what we did. And we submit that's not a rational construction. I agree that the master agreement is very carefully crafted to allow for contingencies, but the important piece of that is that the contingencies were ____. It's logical. It basically would say that if the supplier is unable for whatever reason to perform the contract, in terms of the consequences of that, before they can recover and come back and sue for money damages or seek relief from you, they've got to cover themselves. When they cover, they are covering their loss, which means that that's a liability they're not going to pass back to you. I agree, but then you add alternative two, which is the other piece of the argument, which contemplates that when Suncor can't deliver because it isn't profitable for it to do so, they've got to pay us $2.50 a barrel for whatever they don't deliver. That's the other side of it. So it's balanced out. I mean, each party, seller and buyer, are obviously in very different positions in this relationship. But what you see in all of these arrangements and the confirmation, together with the master agreement, is an attempt to balance out the risks so that, yes, they're the exclusive supplier. If they can't supply because it wouldn't be profitable for them to do it, okay, well, that's fine. Go sell it someplace else and make more money, but we get $2.50 a barrel. In exchange for that, you're our exclusive supplier and we're at your mercy. So you balance out the mercy with alternative number two and the profitable market on our side, and you balance out their right to make a lot of money with a $2.50 charge. So it's all we submit of a piece, and you can't read all these pieces in isolation. Sure, an obligation to cover is mitigate damages is fairly standard, but you have all these other pieces on the other side of the agreement to balance out this confirmation. So when you read alternative two together with the exclusivity, you see the delicate balance that was created in this confirmation and why the parties would intend for each confirmation to govern. Now what alternative two gets us in terms of damages applies to most of the period of time, not all of it that's laid out in our brief, but it would allow Suncor to go to trial on the question whether we're entitled to the benefits of alternative two. It's a take-or-pay arrangement, and if they decide not to deliver, then they cannot deliver. They're not necessarily in breach, but we get to invoke alternative number two, which is how the balance is struck, and we submit that balance is out the cover. The only other issue of consequence and liability is the notice issue that's fully briefed in our papers as to the constant communication between the parties. Everybody knew what was being delivered and what wasn't being delivered, and there was no question from the correspondence between the parties that Suncor was well aware of its obligations. If it didn't deliver the full amount, then we'll rely on a brief for the other issues. Thank you very much. Thank you, Mr. Sherker. You've saved time for rebuttal. Thank you. Mr. Boyle. May it please the Court. Based on the questions from the Court so far, I think it bears noting that there are actually two separate breach of contract claims that are at issue on this appeal. What I would like to do is actually talk about alternative number two first because that's a much different animal than the claim that we've been going over related to cover. So alternative number two is an actual provision under the contract where Muscat says that Suncor failed to pay these $250 per barrel fees based on certain conditions. If you look at that provision, it has very specific conditions proceeding, and that's what the district court looked at in dismissing that claim. It looked at what does the contract actually say, and it applied those provisions exactly as they're written. So alternative number two was an issue where Muscat came in, and after extensive discovery, and this was not a seat-of-the-pants summary judgment order. This was after the close of discovery, after more than 15 depositions, after hundreds of thousands of pages of documents were produced. The court looked at this evidentiary record, and it said, Muscat, you need to prove under alternative number two that both Suncor and Muscat exhausted reasonable commercial efforts but were unable to identify a profitable market for that committed volume of crude oil. That's just directly from the contract. That's all the court did was read the contract and apply that. Then when it looked at the actual evidence that Muscat attempted to submit to support that claim, Muscat didn't actually have anything other than it asked the court to assume if Suncor did not deliver the full committed volume, then it must have been because Suncor and Muscat were unable to find a profitable market for that oil. The court said that's not enough. You have to actually look at these conditions proceeding and come in and show that the parties exhausted commercial efforts and were unable to find a profitable market for that crude. So that's an issue where Muscat did not come in and support that breach of contract claim with any specific evidence. It bears, I think, kind of noting that the actual evidence they submitted, it's really just in their brief they cited two witnesses, both of which said the same essential thing that if Suncor did not deliver the oil, then we just need to assume there wasn't a profitable market for it. The district court said that's simply not enough to support your burden on summary judgment. If you look just at these declarations that were submitted, they're very conclusory. Also behind that, those witnesses were deposed in this case. It's interesting because Muscat did not cite the deposition of the expert whose declaration it submits. If you actually look at the deposition, the expert will come in and tell you exactly what he did, which he simply speculated. He was asked, what are you basing your opinion on that reasonable commercial efforts were exhausted and the parties were unable to find a profitable market? And he said, I assume if Suncor was able to find a profitable market, they would have delivered the oil. That's not enough to support their claim here. On the actual, and it's important, too, on this, there's some argument about the district court reading in a requirement into that alternative number two about the parties working together and negotiating. That's not actually what the order said, if you read it. The district court said, I would expect to find some other kind of evidence to support this. And it gave an example. For instance, the parties negotiating on the price, Muscat offering a price for oil that Suncor then looked at and said we cannot deliver that oil because it wouldn't be profitable for us to do it. There's not evidence of that in the record. As far as the cover issue, the cover issue, exclusivity, we get to that as a second issue on the next breach of contract claim, which is a very broad claim of Suncor failed to deliver the crude oil in the committed volumes of the contract. There's actually also a counterclaim from Suncor that Muscat failed to receive that crude oil because during the overwhelming majority of this agreement, it's a two-year period, Muscat actually didn't have capacity to take the oil. So the reason why the oil wasn't being delivered was that Muscat didn't have enough storage capacity or rail cars at its terminal to take the oil off of Suncor's trucks. So if you look at that broader breach of contract claim, breach of contract claim number two, look first, before you even get to cover, you can look at the bar on consequential damages. And it's important because that's section SA, another portion. It's a different provision of the contract. And that bars any kind of lost profits or consequential damages. And as the court mentioned, this is a heavily negotiated contract by two very sophisticated parties. They took into consideration market risks, the unknowability of prices of crude during this time frame, and they looked at it and they agreed neither party is going to be able to recover consequential damages. Now, that doesn't apply to alternative number two. That's a specific condition, and we're not arguing that it does. So consequential damages provision, if you look at that, the district court looked at it and said, Muscat, what you are asking for under your second breach of contract claim falls squarely within the definition of consequential damages, and we have to apply that as written. The interesting part is that neither in the district court nor in this appeal, Muscat has conceded in both that it was seeking consequential damages under that provision. So instead, to try to get around what it expressly agreed to, Muscat comes in and tries to manufacture some kind of conflict with the other provisions of the agreement. Now, if you actually look at that, they were kind of piggybacking on these arguments they've made about exclusivity, but there's no explanation whatsoever in these briefs about how an express waiver and bar on consequential damages somehow conflicts with any other provision of the contract. It doesn't conflict with exclusivity. It doesn't conflict with alternative number two. We're not even arguing that it applies to alternative number two. So that's a glaring hole in the defenses to that second breach of contract claim before you even get to the cover provision. It is an outright bar to their claim, and that means that Muscat can't go forward on that second breach of contract claim either. There was some mention about the notice issues on both of these claims. So there is an issue with, as sort of an alternative holding, the district court looked at this and said both of these breach of contract claims were barred by lack of written notice, and I think that's fairly straightforward. It's a provision that applies very broadly to any claim for deficiencies in the amount of oil delivered during any time of the contract. So under that, Muscat had to actually provide written notice of a claim against Suncor for underdeliveries of oil. Muscat knew it needed to do it, and it knew how it needed to do it, because it actually did at some point during this two-year agreement, but it did it much later on in the agreement, which actually, if you look at the facts of the case, it makes sense, because up to that point, Muscat couldn't even take any of this other oil. It didn't have the capacity to do it. So up until September 2014, Muscat did not send out any of these notices of deficiencies of a claim against Suncor. It did it in September. It did it in December. It knew how to send out the notices. It knew that that applied to the contract, and it did it then, but it didn't do it before that time frame. Simply calculating how many barrels of oil are delivered each day under the contract is not a notice of a claim to Suncor that you've underdelivered under the contract. Those are two entirely different things, and that's what the district court found as well. The other issue that we haven't gotten into so far are the fraud claims. So Muscat has their breach of contract claims. Before that, we went through discovery, went through the entire case on the breach of contract claims, but Muscat also had separate fraud claims that were dismissed at the dismissal phase. That was actually after, again, Muscat had two opportunities to amend its complaint. What it was actually doing and what the district court saw is that Muscat was really trying to repackage these breach of contract claims as a fraud claim in order to get around these damages, limitations for consequential damages, to get around the conditions of alternative number 2, to get around the cover provision. It was transparent to the court that they were simply repackaging allegations that were breach of contract claims. So the court actually looked at two different sort of subsets of their fraud claim, looked at those very specifically, said, Muscat, on the first claim, you're simply saying that Suncor misrepresented its capacity and intent to deliver the crude oil volumes that were actually subject to the agreement. And the court said that's simply a repackaged breach of contract claim. That's not a fraud claim. So the court dismissed those on that basis. It looked at the second portion of the fraud claims, and it was something a little different in the sense that the court looked at it and said, well, I guess this could be somewhat outside of the contract. And what Muscat was saying was that Suncor in, I believe, the spring of 2014, so well into the contract, they said that Suncor represented to Muscat that they would be interested in doing a pipeline connection to this rail terminal rather than having these trucks deliver crude to the terminal, and they would be interested in extending the contract possibly in the future after this two years goes. And so Muscat has claimed that those representations were made because Suncor wanted a discount if they failed to deliver in the future in August and September of 2014, they wanted a discount on any of these fees under alternative number two. So the district court looked at that and said it's not plausible to look at this and conclude that Suncor came in and said it was interested in doing a pipeline connection, and then months later it did that because months later it was going to under-deliver oil. And there was no way of kind of tying those events together on a time basis about how did that constitute fraud. How did Muscat rely on that? How was that a fraud in any respect? And so the district court dismissed that claim as well. One thing that I have noticed in the briefing, and I think the court probably gets this completely, but Muscat had argued that on state law, New York law pleading standards, that the court was asking too much here. Well, the district court was simply applying the federal pleading standards that it's obligated to apply, and it looked at it and said this is not enough to satisfy a fraud claim. You didn't have the who, what, when, where, how of each representation and an explanation of how that's fraudulent. Instead, what Muscat did in the appellate brief was it came in and it had a list and it had these bullet points of all these different allegations under who, what, when, where, how. They're actually kind of all over the place, and they don't actually tie together for the court. The court will tell us in plain language how do these different elements apply to your actual fraud. So Muscat throws in some of the who related to the contract obligations. It throws in some of the who related to the pipeline connection, but it never actually ties together how that constitutes fraud, and it doesn't explain how just throwing those out there, including contract obligations, is fraudulent at all. The cover obligation. I want to make sure that I cover what the court had been getting into. I think it's been well covered, but I also want to just present myself for questions on that if there are questions from that perspective, but I think the court gets it. There's not a conflict here. This was negotiated. It's provision that's very common. It's very common to require cover obligations, and the district court actually did something interesting because a lot of the questions today were when would cover ever apply, and Muscat's interpretation of the contract, cover would never apply, even though it's an express language in the contract. It's a provision in the contract that was negotiated. They just say it will never apply, and it seems a little confusing the way this is being explained. The master agreement and the confirmation, those are all together. We agree. That's one contract. It's over a two-year period. There wasn't some kind of thing where this was contemplating that each delivery is a different contract. That's not how this works. You have the contract. The court has it. It's all together. It references the other provisions, and the district court actually looked at that very carefully because it wanted to get it right. It looked at it and said, well, you know, there would be a situation where the exclusivity comes into place and Muscat is not obligated to recover, and that's where you have specific provisions like alternative number two and alternative number one, and Suncor is not arguing that Muscat had to cover in those situations. To the extent that there are no questions on the cover obligation, I am going to get in a bit to the counterclaims by Suncor. Those were also dismissed on the summary judgment phase of the case. So after Suncor was sued in this case, including this sort of broad claim by Muscat saying you failed to deliver crude to us and so you breached the contract, well, Suncor then asserted counterclaims under the same contract and said, Muscat, you failed to purchase and receive our crude oil, and part of the reason there is that a substantial part is that they just didn't have the capacity to take it on, and the record bears that out that over and over from the beginning of this contract, Muscat could not take the oil because it didn't have rail cars available. It didn't have storage tank capacity. It wasn't operating the terminal correctly for the rail schedule. So what is, I appreciate that you're speaking to the summary judgment record. Specifically, did Muscat give any specific response in terms of how it was that there was not capacity, or is that just something that's taken care of from documents that you already had? What is their answer, as you understand it? The answer during the first, I would say, probably 18 months of the contract is that we're having problems with the railroad system. We don't have enough rail cars here. When we do have rail cars, we don't have enough storage of where the cars can come in and actually park on the rails. And then on top of that— That sounds like an admission that they didn't have the capacity. That's what I'm asking you. Is it fair to say that they have admitted that they didn't have capacity, or was there some other extraneous matter that wasn't under their control, according to their position? I would say, yes, that's right. Which one is right? Yes, they did admit in documents that for a substantial portion of this contract, they did not have capacity to take the oil. What they would say is, okay, we contract for 20,000 barrels per day for this month. We're not there yet, Suncor. We can't take that yet. We haven't gotten the oil schedule down. We don't have an extra tank. There's actually internal documents where Muscat looks at it and says, maybe we need to build an extra storage tank for oil because then Suncor can offload the oil and we'll have it there. They looked at that. They didn't do it. They looked at, well, can we get more rail cars there? They had their rail experts internally look at that, and they said, well, we really can't because we don't have the on-site storage. So if you're asking, did anyone during the depositions come out straight out and say, you're right, we're wrong, we got this wrong, not necessarily a complete, straightforward, from my perspective, great admission that I could use in front of a jury, but putting together all the admissions, the back story of it, and also the traders talking. The traders are pretty honest where Muscat's trader says, look, we can't do 20,000 barrels per day this month. There's just no way. We're not there yet. We're expanding the terminal. And the interesting part of that is one of the issues that you look at there is that they actually did an internal calculation where they said, we need 80,000 barrels of storage tank capacity on site in order to move the amount of oil that we're asking Suncor to deliver. And then they looked at it and they said, actually, we only have about 35,000 barrels of storage tank capacity, but we're going to use these other rail cars as sort of what they call rolling storage. So when Suncor comes, we'll offload to the rail car. It will sit. And then once we get enough cars, we'll send out the entire train. But even then, it only added up to about 62,000 to 68,000 barrels. So they were short. Even with this optimal rolling storage, that's not really the way you want to run a rail terminal. Even with that, they couldn't reach the 80,000 barrels. So they did admit in depositions, they did say, well, yeah, I see that. Our engineer said we needed 80,000 barrels. We didn't get there. And they said, but we were really trying. So what is the legal error that you're claiming in your counterclaim? There are two different issues. Number one is we claim there's a provision in the contract that says if they don't have enough rail cars on site, then we get a $1.50 per barrel fee for each time we have to send crude oil to another alternate point, delivery point. So they would offload it to another point. What the district court said is that that requires a mutual agreement on that alternate delivery point. And it used the definition alternative number one, a separate provision, to apply that mutual agreement requirement. The issue there is that mutual agreement, it makes sense in alternative number one, which is a separate provision of the contract because we would actually be using Muscat's rail cars in that situation. In this other provision, we would not be doing that because Muscat doesn't have the rail cars to take it. So we send it to another point. What they're saying the contract reads, and what we think the district court got wrong, is that we would have to get Muscat's agreement every time we wanted to deliver crude to another location, even though Muscat didn't even have the rail cars to take it. So in order to get that $1.50 fee, or to avoid it, all Muscat had to do is say, we know we don't have the rail cars, it's our fault, but we do not agree to have you divert your oil to another location. That is sort of the essence of being commercially unreasonable because it would never apply. A company wouldn't come in and say, yes, okay, deliver over there, we'll pay you the $1.50 fee. They could simply say no. Second point, legal issue, and I'm running out of time, is the reasonable commercial efforts to ensure the Windsor Terminal had capacity to accept the oil. The court said that we needed a more objective standard from an expert witness to tell us what commercially reasonable meant in that situation. The way the contract reads, it has specific examples of what the standards are. So in our view, you don't need an expert to come in and say what the objective standard is, even if you did. Muscat had experts who came in and said, this is what we would need to do. We need 80,000 barrels of storage. We need this to be a unit-trained terminal. We know that because we operate other terminals, and we didn't get that done. And so we submit that that is an objective standard, and there is evidence that Muscat failed to meet that. All right, thank you, Mr. Boyle. Mr. Sherker, you've saved time for rebuttal. If I could start with a counterclaim. The district judge didn't reach any of the factual issues that my opponent was discussing this morning, nor are they undisputed. They weren't pleaded as undisputed. They weren't argued as undisputed. I refer the Court to Mr. Feldhansen's declaration, which was attached to our response to the summary judgment motion, and specifically where he states in paragraph 10 of the declaration that the declaration specifically states in paragraph 17 that, quote, Muscat completed an extensive infrastructure enhancement of the Windsor Terminal and expected to fully utilize these assets during the course of Suncor's contract with Muscat. Among other damages or losses, these assets, along with large numbers of rail cars, often sat unused because of Suncor's failure to deliver the agreed-upon amounts of crude oil. So you have a fight between the parties. Was it their fault for not delivering? Was it our fault for not being able to accept delivery? That's what trials are for. What the district court resolved— So just in plain language, and I appreciate you're going through the record, and obviously we'll do the same thing, so there's nothing wrong with the presentation you're giving. But in plain language, what is your answer? Did you have capacity or did you not have capacity? We maintained we had the capacity, but my main point is that's not what the district court ruled on. The district court granted summary judgment. Okay. But there was a counterclaim that said you didn't have capacity. Your position is— We did. You always had capacity. Yes. And was that because in part or in whole that you were relying on the availability of rail cars that would sit there as temporary storage tanks? Yes, Your Honor, among other things. But actually our entire fraud claim is we relied on their promise that they were going to be delivering under the contract to expand the terminal. Our damages are that we expanded and didn't get the oil. But again, if I can bring the court to the actual ruling that's before you today, the ruling on the counterclaim is that, first, Suncorp didn't satisfy the condition precedent to even bringing a claim for an alleged three-month— it has to be three months, mind you—period of not being able to deliver because they did not deliver to what's called an alternative buyer delivery point, which is defined in the contract itself as a defined bold term as a delivery point and a buyer to which and to whom the parties agreed. It's defined in alternative two, and two pages later it appears in subparagraph two, which is the first basis for their claim. So unless they satisfy the condition precedent, they can't even invoke a claim for damages in their counterclaim. And the second basis was under New York law, unless it's an area that any fact finder, meaning a jury, would readily understand to show what's commercially reasonable efforts requires an expert witness. Even though there were examples? There are EGs, if you will, Judge. But as the trial judge himself ruled, I don't know what's reasonable commercial efforts in the context of this unique volatile market, and the jury's going to need an expert to be able to identify it. So what do we do with the EGs? Do we just read them out as inkblots? We apply New York law. In this instance, this is the only instance in this case in which it matters which law governs, otherwise it's standard contract principles. But New York law requires an expert to explain to a jury not what best efforts are. If they had a best efforts clause, everybody knows what best efforts are. But commercially reasonable efforts in this market, in a terminal in northern Colorado where oil is being trucked in from various places, yes, a jury needs to understand what's a reasonable commercial effort. We fully intend to prove, as I pointed out, that we made those efforts. That's in Mr. Felthansen's declaration. But the legal issue is simply whether they can go forward without an expert. The district court applied New York law and said they required an expert to explain to a lay jury what's a reasonable commercial effort in this unique area, in this unique industry. So as to the consequential damages is the last point I'd like to touch on. We didn't make this up. The district court ruled that because we're wrong on the cover obligation under subchapter S, for the same reason, we don't get consequential damages. And yet in the confirmation, we have alternative number two, which says if they don't deliver because there's no profitable market, we get $2.50 a barrel. So it can't be that we get no consequential damages under the agreement, but we get $2.50 per barrel under alternative number two. Again, the confirmation governs, and that's a central error in the district court's ruling. Thank you very much. All right. Thank you, Mr. Shurker. Your case and both of today's cases are under submission.